646 So.2d 890 (1994)
STATE of Louisiana
v.
Theodore SCHIRMER.
No. 93-KA-2631.
Supreme Court of Louisiana.
November 30, 1994.
Rehearing Denied March 9, 1995.
Order Concurring in Denial of Rehearing March 9, 1995.
*892 Richard P. Ieyoub, Atty. Gen., Douglas P. Moreau, Dist. Atty., D. Carson Marcantel, Gwendolyn K. Brown, Baton Rouge, and James M. Ross, Monroe, for applicant.
Richard M. Upton, Baton Rouge, for respondent.
Daniel C. Wirtz, Baton Rouge, for Fox McKeithen, Secretary of State (amicus curiae).
CALOGERO, Chief Justice.[*]
The State of Louisiana filed a bill of information charging Theodore Schirmer with violating LSA-R.S. 18:1462(A), subsections (2), (3) and (4). In order to provide a sanctuary around polling places so that the electorate might exercise its right to vote without interference and without fear of harassment or intimidation, this statute effectively prohibits all political speech, including that unrelated to matters on the ballot, at a distance of up to 600 feet from polling places on election days.[1] Defendant filed a motion to quash the information, alleging that the statute under which he was being prosecuted was unconstitutional. The trial court granted the defendant's motion, finding the statute's proscription of all political speech, including that unrelated to matters on the ballot, within 600 feet of the polling place on election days, to be an unconstitutionally overbroad limitation upon the defendant's right of free speech and expression. The State of Louisiana sought review in this Court, invoking our supervisory and appellate jurisdiction. We docketed the case as an appeal under Article V, § 5(D) *893 of the Louisiana Constitution of 1974, since it involves a statute's having been declared unconstitutional.
After considering the statute and the record, we conclude that the trial court was correct in its determination that LSA-R.S. 18:1462(A)(3) and (4) are unconstitutionally overbroad. In addition, we find LSA-R.S. 18:1462(A)(2) unconstitutionally vague, as it fails to establish adequate guidance to authorities for its enforcement. For the reasons set forth in this opinion, we affirm the judgement of the district court declaring the statute unconstitutional, in violation of the First and Fourteenth Amendments of the United States Constitution.

I. Facts and Procedural Background
Defendant Theodore Schirmer is the executive director of a group which styles itself "Recall '92, Inc." The organization's principal objective was to recall the Governor. It was first necessary to obtain the signatures of one-third of the electorate on a recall petition within a 180-day period.[2]See LSA-R.S. 18:1300.1 et seq.
In October of 1992, the period relevant to this case, Recall 92 was in the middle of its drive (it had until December) to collect the required number of signatures (they were still in need of 750,000 signatures) to force a recall election. Given the voter interest in the November, 1992, presidential election, Recall '92 decided to solicit signatures at polling places during the primary election of October 3, 1992, and the general (presidential) election of November 3, 1992.
This decision by Recall '92 to appear at the polls on October 3 was influenced in part by a belief that the solicitation at polling places of signatures for the recall petition would not constitute a violation of Louisiana law. Theodore Schirmer, a lawyer by profession, was aware that the Attorney General had issued two opinions addressing the solicitation near polling places of signatures for petitions unrelated to matters on the ballot. These opinions were that such a solicitation of signatures neither violated the Election Code generally nor LSA-R.S. 18:1462(A) specifically, as long as the activity did not interfere with the voting process. See Atty. Gen.Op., Nos. 91-597 (November 12, 1991), and 92-650 (September 24, 1992).
On October 1, 1992, however, two days before the scheduled primary elections at which Recall '92 planned to make its appearance, the Attorney General issued opinion No. 92-650(A). In that opinion the Attorney General, relying upon Lacour v. State of Louisiana, No. 90-C-1772 (La.App. 4 Cir. 1990), an unpublished opinion out of the Fourth Circuit Court of Appeal, recalled and rescinded his two prior opinions.
Schirmer received a copy of Attorney General Opinion No. 92-650(A) several days prior to the October 3 election. Although Schirmer instructed Recall '92 members to leave polling areas if requested to do so by a poll commissioner, he decided he would personally challenge the constitutionality of LSA-R.S. 18:1462(A). Accordingly, he alerted the officials charged with enforcing the Election Code of his intentions.
On October 3, Schirmer first attempted to vote at his registered precinct, University Terrace in Baton Rouge, but was denied access to the polls because he was wearing a t-shirt bearing a "Recall '92" slogan. Schirmer departed, without incident and without casting a vote, and travelled to the polling place at Lee High School, also in Baton Rouge, where, under the gaze of poll commissioners and other officials, he set up a table and began gathering signatures for the recall petition. After Schirmer refused verbal and written directions to leave, he was placed under arrest.
Following his arrest, Schirmer and related parties filed suit in federal court seeking declaratory and injunctive relief against the enforcement of LSA-R.S. 18:1462(A). On October 19 and 20, 1992, the United States District Court for the Middle District of Louisiana, Polozola, J., presiding, conducted a two-day trial to determine the constitutionality of LSA-R.S. 18:1462(A). At the trial's conclusion, the district court, relying primarily upon Burson v. Freeman, ___ U.S. ___, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), found that the statute was constitutional. Accordingly, *894 he dismissed the plaintiffs' lawsuit and denied injunctive relief for the November 3 election.
Plaintiffs appealed the federal district court's decision to the United States Fifth Circuit Court of Appeals, seeking in the interim temporary injunctive relief pending appeal. In response to the latter, a panel of the Fifth Circuit certified the following question to this Court pursuant to La.S.Ct. Rule XII:
Whether La.R.S. 18:1462A proscribes on election day, outside of the polling place itself but within a radius of six hundred feet from the entrance thereto, all solicitation of signatures for a recall petition that is not on the ballot that is to be voted on at the election for which the polling place is open, and in the polling place or said six hundred foot radius all wearing of clothing or buttons bearing visible words or symbols supportive of such recall?
Schirmer v. Edwards, 608 So.2d 948, 948 (La.1992).
On October 29, 1992, this Court responded to the certified question. We began by noting that "the clear intent of this statute, when taken as a whole, is to prohibit political activity within 600 feet of the polls on election day in order to prevent disruption of the polling place and the election process." Schirmer, supra, 608 So.2d at 949 (La.1992). Applying the statute to the particular facts of this case, the Court found that although LSA-R.S. 18:1462(A)(1) did not apply to Schirmer's actions, "subsections (3) and (4) clearly prohibit the conduct at issue."[3]Id. Specifically, we stated the following:
We find the solicitation of signatures for a recall petition not on the ballot of that election, but which its backers ultimately hope to get on the ballot, fits this broad definition of handing out or displaying campaign literature. Likewise, we hold the wearing of clothing or buttons supporting such a recall effort is a display of political advertising prohibited by subsection (4).
Id., citing Atty.Gen.Op., No. 92-650(A), and Lacour v. State of Louisiana, supra. We were careful to note, however, that "our opinion deals only with the question certified [one regarding statutory interpretation], and we do not pass on any issues of constitutionality under either the United States Constitution or the Louisiana Constitution." Id., at 948 n1.
Upon receipt of our answer to the certified question the Fifth Circuit, and armed with this Court's construction of LSA-R.S. 18:1462(A), granted Schirmer's and the other plaintiffs' motion for injunctive relief pending disposition of their appeal.[4] Specifically, the federal appellate court enjoined state officials from enforcing LSA-R.S. 18:1462(A) so as to preclude Schirmer and others from soliciting, on public streets, sidewalks or other outdoor public areas, signatures for the recall petition at polling sites during the November 3 presidential election. Schirmer v. *895 Edwards, No. 92-3900 (5th Cir. Oct. 29, 1992). The injunction did, however, allow enforcement of the statute within 100 feet of the entrances to polling places.
In state court, meanwhile, the criminal prosecution of Schirmer for violating LSA-R.S. 18:1462(A) proceeded, and on July 19, 1993, a hearing was held in conjunction with Schirmer's motion to quash the bill of information.[5] In conjunction with this hearing the State and Schirmer entered into a joint stipulation of fact which set forth the following:
(1) On October 3, 1992, and at all pertinent times the defendant was conducting his activities within one hundred (100) feet of the polling place at Lee High School, East Baton Rouge Parish, Louisiana;
(2) The activities being conducted by the defendant were concerned solely with the issue of the recall petition of Governor Edwin Edwards which was not on the ballot;
(3) The defendant was not harassing or intimidating any person who was at the polling place to vote;
(4) The defendant was provided written notice to cease his activity or move from the area within six hundred (600) feet of the polling place by the person authorized to provide such notice at the polling location and defendant refused to comply with the written request;
(5) A police officer was summoned and defendant was arrested for failure to cease his activity within six hundred (600) feet of the polling place.
After considering this joint stipulation and the testimony of several witnesses,[6] the trial court declared the statute unconstitutional and quashed the information. The judge noted that Louisiana's 600-foot boundary was the second largest in the United States, and that "the majority of states enforce a 100-foot boundary."[7] In addition, the trial court considered the United States Supreme Court's pronouncement in Burson v. Freeman, supra, and concluded that "[i]n the Burson case the Supreme Court didn't give you a whole lot to go on other than to say there is nothing wrong with a hundred feet." The judge concluded that the statute as drawn was unconstitutionally overbroad insofar as it prohibits all political activity within 600 feet of polling places, and sustained Schirmer's motion to quash "on that basis alone and no other." The State of Louisiana took exception to this ruling, and moved for and received permission to seek review in this Court. See La. Const. Art. V, § 5(D).
Two months later, the United States Fifth Circuit[8] handed down a final decision in Schirmer's federal appeal. Schirmer v. Edwards, *896 2 F.3d 117 (5th Cir.1993). Like the federal and state district courts before them, the Fifth Circuit found Burson v. Freeman, supra, the controlling precedent. Following the analysis of the Burson plurality,[9] the Fifth Circuit found that the Louisiana statute implicated three First Amendment Concerns ("regulation of political speech, regulation of speech in a public forum, and regulation of speech based on content"), and that therefore "[s]trict scrutiny requires Louisiana to show that Section 1462 is narrowly tailored to achieve a compelling governmental interest." Schirmer, supra, 2 F.3d at 120 (citation omitted).
After examining the record before it, the Fifth Circuit concluded "that Louisiana undoubtedly has a compelling interest to protect its citizens' right to vote." Schirmer, supra, 2 F.3d at 121. However, at this point in its analysis the Fifth Circuit departed from the prior finding of the state district court under review here, as well as from the reasoning of the prior Fifth Circuit panel which had granted Schirmer and the other federal plaintiffs an injunction for the November 3 election. The federal appellate court found the statute to be "narrowly drawn and not an excessive infringement on the First Amendment." Id., at 124. In addressing the statute's embrace of all political speech, not only speech related to matters on the ballot, the Fifth Circuit found that "[t]he need for a total ban is compelling and Section 1462 is not overbroad." Id. Based upon these findings, the Fifth Circuit found that Louisiana's statute represents a "constitutional compromise" and affirmed the district court's dismissal of Schirmer's and the other federal plaintiffs' suit. Id.[10]
Thus, to summarize, the case now before us arose out of the arrest of Theodore Schirmer on October 3, 1992. That arrest led to the filing of a federal civil suit by Schirmer and related parties, and to a criminal prosecution of Schirmer by the State of Louisiana. The federal suit proceeded to trial first, with the district court finding the statute under which Schirmer was arrested constitutional and dismissing the lawsuit. A panel of the federal appellate court, however, expressing doubts as to the statute's constitutionality under the First Amendment, issued an injunction favorable to the federal plaintiffs regarding the November 3, 1992, elections. Following this action, the state district court, following the reasoning of the federal appellate panel which issued the injunction, granted a motion to quash on the grounds that the statute was an unconstitutionally overbroad impingement of Schirmer's right to free speech and expression. A different panel of the federal appellate court, however, subsequently departed from the reasoning of the earlier panel and found the statute constitutional, affirming the United States district court's dismissal of the federal civil lawsuit. We now consider, in review of the decision of the state district court quashing the information in the criminal prosecution, the constitutionality of LSA-R.S. 18:1462(A)(2)-(4).

II. Discussion
As the lengthy procedural history of this case suggests, the issues which we consider in this opinion have already been examined in a number of fora, leaving this Court with some not entirely consistent opinions regarding these matters. At the outset we deem it advisable to set forth the basic principles of First Amendment[11] jurisprudence which will guide our review of this case.

*897 A. Fundamental Precepts of First Amendment Review
The United States Supreme Court has adopted (as in many areas of constitutional jurisprudence) a means-ends analysis or "balancing" approach in assessing the validity of state action which burdens a citizen's exercise of free speech. See Konigsberg v. State Bar of California, 366 U.S. 36, 49-51, 81 S.Ct. 997, 1005-07, 6 L.Ed.2d 105 (1961), re'hg denied, 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961), and other cases cited herein. Under this approach, the State's purpose and the means used to achieve that purpose must be sufficiently related to justify any limitation upon free speech, although the extent to which a reviewing court will probe that means-ends relationship is dependent upon the context in which the State action operates and the burden which it imposes. See Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 573, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500 (1987); Cornelius v. NAACP Legal Defense and Ed. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). For example, regulation of speech which does not focus upon the particular content of the speech sought to be regulated, but rather which seeks only to limit the time, place, or manner of speech in a non-public forum is subject to a less exacting standard of scrutiny, and the fit between the ends sought and the means used to achieve such regulation must merely be "reasonable" for it to survive judicial scrutiny. See United States v. Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion) (postal walkway is a non-public forum, and therefore reasonable, content-neutral regulation is constitutionally permissible). See also Thornburg v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).
However, LSA-R.S. 18:1462(A)(3) and (4),[12] which forbid the distribution of campaign literature and political advertising, are not content-neutral restrictions. Rather, these subsections of the statute, as construed by this Court, operate to prohibit all "political speech," albeit only within prescribed boundaries. Schirmer, supra, 608 So.2d at 649. Such content-based[13] regulation of speech is subject to strict scrutiny, particularly when that regulation takes aim at "political speech," a category of speech to which "the First Amendment `has its fullest and most urgent application.'" Eu v. San Francisco Democratic Comm., 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989), quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). See also Boos v. Barry, 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988) ("a content based restriction on political speech in a public forum ... must be subjected to the most exacting scrutiny"); First National Bank of Boston v. Bellotti, 435 U.S. 765, 784-785, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978) (citation omitted) ("[i]n the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue"). Indeed, "there is practically universal agreement that a major purpose of (the First) Amendment was to protect the free discussion of governmental affairs." Mills v. *898 Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). Accordingly, for a challenged statute to survive strict scrutiny it must be shown that the statute is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). See also Simon & Schuster, Inc., supra, at 117-18, 112 S.Ct. at 509.
This case offers a slight variation upon the "strict scrutiny" formula, however, because the affected interests include not only the State's interest in regulating elections and the citizen's interest in free speech and expression, but also the citizen's right to vote without being harassed or intimidated. Thus, this case requires that the defendant's right to free speech be reconciled with separate concerns which also possess a constitutional dimension.[14]Compare Sheppard v. Maxwell, 384 U.S. 333, 361-363, 86 S.Ct. 1507, 1521-1522, 16 L.Ed.2d 600 (1966) (Court balancing free speech rights of trial participant's against an accused's right to a fair trial). Fortunately, the United States Supreme Court has addressed this "clash of freedoms" in the case upon which all of the courts which previously entertained this dispute relied in reaching their respective decisions, namely Burson v. Freeman.[15]

B. Burson v. Freeman: The First Amendment and the Electoral Process
In Burson, the United States Supreme Court considered the constitutionality of a Tennessee statute which prohibited the solicitation of votes and the display or distribution of campaign materials within 100 feet of a polling place. As noted by the United States Fifth Circuit in its consideration of this case,[16] the Burson Court's plurality found that the statute in question implicated several core First Amendment concerns, and accordingly subjected the statute to strict scrutiny. The result of this scrutiny was the conclusion that the Tennessee statute was enacted to foster a compelling state interest, namely "protecting voters from confusion and undue influence." Burson, supra, ___ U.S. at ___, 112 S.Ct. at 1851. In addition, the plurality observed that "[w]hile we readily acknowledge that a law rarely survives (strict) scrutiny, an examination of the evolution of election reform, both in this country and abroad, demonstrates the necessity of restricted areas in or around polling places." Burson, supra, at ___, 112 S.Ct. at 1852.
Finding that "[a] long history, a substantial consensus, and simple common sense show that some restricted zone around polling *899 places is necessary to protect that fundamental right," the plurality went on to evaluate whether the means utilized by Tennessee's legislature were narrowly drawn to achieve its desired end. Burson, supra, at ___, 112 S.Ct. at 1858. Under the conventional formulation of this aspect of strict scrutiny, the legislative "purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved," and therefore "[t]he breadth of legislative abridgement (of First Amendment rights) must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (footnotes omitted). See also Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").
The Burson plurality at this point, however, departed from the traditional strict scrutiny analysis. It chose, instead, what it termed a "modified `burden of proof" approach, focusing not upon alternative means of achieving the compelling legislative purpose, but rather whether the means chosen by the State "significantly impinged" upon constitutionally protected rights. Burson, supra, ___ U.S. at ___, 112 S.Ct. at 1857. The plurality made clear that this departure from precedent was "because a government has such a compelling interest in securing the right to vote freely" that "`Legislatures... should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively.'" Id., at ___, ___, 112 S.Ct. at 1856, 1857, quoting Munro v. Socialist Workers Party, 479 U.S. 189, 195-196, 107 S.Ct. 533, 537-538, 93 L.Ed.2d 499 (1986). The plurality was also careful to specify the limited context in which this "modified `burden of proof'" was to operate: "it applies only when the First Amendment right threatens to interfere with the act of voting itself, i.e., cases involving voter confusion from overcrowded ballots,... or cases such as this one, in which the challenged activity physically interferes with electors attempting to cast their ballots." Id., ___ U.S. at ___, 112 S.Ct. at 1856 n. 11.
Considering the statutory 100 foot proscription upon campaign advertising and voter solicitation before it, the Burson plurality declared, with little discussion, that "[w]e do not think that the minor geographic limitation prescribed by (the Tennessee legislature) constitutes such a significant impingement." Burson, supra, at ___, 112 S.Ct. at 1857. The plurality did go on to note that "[a]t some measurable distance[17] from the polls, of course, governmental regulation of vote solicitation could effectively become an impermissible burden." Id. Confining its decision to the facts before it, the plurality concluded only that "it is sufficient to say that in establishing a 100-foot boundary, Tennessee is on the constitutional side of the line." Id.

C. Application of the Burson Plurality's Approach to LSA-R.S. 18:1462(A)(3) and (4)
There is no doubt that the activities engaged in by Schirmer constituted "political speech," triggering the strict scrutiny analysis described supra. See Meyer v. Grant, 486 U.S. 414, 421-422, 108 S.Ct. 1886, 1892, 100 L.Ed.2d 425 (1988) ("the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as `core political *900 speech'"). Thus, following the Burson analysis, we must first ask whether the LSA-R.S. 18:1462(A)(3) and (4) are necessary to achieve a compelling state interest. If so, we must consider whether the statute as drawn "significantly impinges" upon the defendant's First Amendment rights.
Like the Burson plurality, we believe that "some restricted zone is necessary in order to serve the States' compelling interest in preventing voter intimidation and election fraud." Burson, supra, at ___, 112 S.Ct. at 1855. This concern is at least as compelling in Louisiana, given what the Secretary of State, in his amicus curiae brief to this Court, terms our "unique and colorful political history, ... a history rife with election tampering, intimidation, and fraud." The record before us contains testimony by a number of state officials attesting to the fact that the challenged statute's purpose is to create a protected zone wherein voters may exercise their right to vote free from unwanted interference or influence. Thus, like the United States Fifth Circuit, "[w]e conclude that Louisiana undoubtedly has a compelling interest in protecting its citizens' right to vote," and that a prohibitory statute somewhat like LSA-R.S. 18:1462(A) designed to protect the sanctity of the ballot box is necessary to further that interest. Schirmer, supra, 2 F.3d at 121.
Given this determination, we move to the question of whether the statute "significantly impinges" upon First Amendment freedoms. Were our review limited solely to the activities of Schirmer and the statute's effect "as applied," this Court, in light of Burson, would have no difficulty in finding defendant Schirmer's activities legitimately proscribed. The record contains a joint stipulation of fact, noted supra, which includes an agreement between the parties that Schirmer was at all relevant times conducting his activities within 100 feet of a polling place. Although not directly related to matters on the ballot, Schirmer's conduct, given his close proximity to the polling place, certainly offered the possibility of disrupting the voting process and intimidating prospective voters.
The Burson plurality observed that within Tennessee's "minor geographic limitation" of 100 feet a comprehensive ban on any activity which threatened the integrity of the election process was permissible. The plurality's reasoning was that although a more narrowly drawn statute, one directly addressing attempts to interfere with the electoral process, might be an available alternative, "[i]ntimidation and interference laws fall short of serving a State's compelling interests because they `deal with only the most blatant and specific attempts' to impede elections."[18]Burson, supra, ___ U.S. at ___, 112 S.Ct. at 1855, citing Buckley v. Valeo, 424 U.S. 1, 28, 96 S.Ct. 612, 639, 46 L.Ed.2d 659 (1976) (per curiam) (existence of bribery statute does not preclude need for limits on campaign contributions). Indeed, "undetected or less than blatant acts may nonetheless drive the voter away before remedial action can be taken." Id. In light of the Burson plurality's approval of the 100 foot boundary employed by Tennessee, were the Louisiana statutory ban on all political speech limited to a 100 foot radius about polling places, we would likely reverse the ruling of the district court declaring the statute unconstitutional.[19]
However, Schirmer's motion to quash was granted by the court below not because LSA-R.S. 18:1462(A) impermissibly prohibited Schirmer's conduct, but rather because in doing so it exhibited an overbroad reach. The doctrine of overbreadth,[20] so-called, is a *901 creature unique to the First Amendment, in particular Free Speech. It applies to statutes which, although used to punish activities which may be legitimately regulated, nevertheless include within their prospective reach speech or conduct protected by the First Amendment. See City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); Hill v. City of Houston, 764 F.2d 1156, 1161 (5th Cir.1985), cert. denied, 483 U.S. 1001, 107 S.Ct. 3222, 97 L.Ed.2d 729 (1987). See also Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970). As overbreadth was explained in NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 338-339, 9 L.Ed.2d 405 (1963),
the (challenged statute) may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct. For in appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar.[21]
LSA-R.S. 18:1462(A)(3) and (4), as construed by this Court in response to the certified question from the United States Fifth Circuit, operates "to prohibit political activity within 600 feet of the polls on election day." Schirmer, supra, 608 So.2d at 949. Although we do not regard as unduly onerous such a prohibition (on all political activity) within the narrow confines approved in Burson (100 feet), when that blanket proscription on political speech is extended to 600 feet we find that "a difference only of degree" becomes a difference of kind, a difference of "constitutional dimension." Burson, supra, ___ U.S. at ___, 112 S.Ct. at 1857. This is particularly true when the 600-foot limitation is considered in a crowded urban context, where, because of greater population density, polling places tend to be more closely situated. In such circumstances the 600 foot radius may often include a large number of surrounding streets, alleyways, and neutral grounds, with the application of the statute as written stifling political speech in traditional public fora. See Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) ("[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public"). We find such a burden upon the exercise of First Amendment rights to be a "significant impingement" on those rights, and thus conclude that LSA-R.S. 18:1462(A)(3) and (4), insofar as they prohibit all political activity (including that unrelated to ballot matters) within 600 feet of a polling place on election day, are unconstitutionally overbroad.
This is not to say that a more narrowly drawn statute, perhaps one which addresses only advertising and voter solicitation relative to matters on the ballot, like the 100 foot Tennessee statute in Burson, supra, but one which operates within 600 feet of a polling place, would similarly fail to pass constitutional muster. After all, the more narrowly tailored a statute is, the less protected speech it reaches, and concomitantly the less it impinges upon First Amendment freedoms. The "modified `burden of proof'" test *902 announced by the Burson plurality does not dictate that we consider whether, in achieving its goals, there are no alternatives available to the State which are less burdensome on First Amendment freedoms. Rather, we are required only to examine the extent to which the means chosen by the State burdens the exercise of First Amendment rights, i.e. whether those rights are "significantly impinged" by the State action.
We stress that there is no mathematical formula which marks the zones of permissible and impermissible regulation of speech, no "`litmus-paper test' that will separate valid from invalid restrictions." Burson, supra, ___ U.S. at ___, 112 S.Ct. at 1857, quoting Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983), quoting Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). The constitutional problem with LSA-R.S. 18:1462(A)(3) and (4), as construed by this Court in our response to the Fifth Circuit's certified question, is not that their effect reaches as far as 600 feet from polling places.[22] Nor are these subsections invalid solely because they impose a prophylactic ban upon all political speech; we have already stated earlier in this opinion that we read Burson to approve such comprehensive restrictions within 100 feet of polling places. Rather, today we hold only that when both of these aspects of the challenged provisions operate in tandem, extending a total ban on political speech to a distance of 600 feet from polling places, the resulting limitation of free speech at that point overburdens or "significantly impinges" First Amendment freedoms. The Burson plurality found "it sufficient to say that in establishing a 100 foot boundary, Tennessee is on the constitutional side of the line;" we find it sufficient to say that in establishing a 600 foot boundary which proscribes all manner of political speech, not just speech related to matters on the ballot, Louisiana has crossed that line.

D. The Constitutionality of LSA-R.S. 18:1462(A)(2)
Our decision to strike LSA-R.S. 18:1462(A)(3) and (4) as unconstitutionally overbroad does not complete our consideration of this case. Schirmer was also charged with a violation of LSA-R.S. 18:1462(A)(2), which makes it a crime to remain within 600 feet of a polling place after being given written instructions to leave by a poll commissioner or law enforcement officer. Since the constitutionality of this subsection of the statute was also implicated by the district court's quashing of the information, it is necessary to consider the constitutionality of this subsection of the statute as well.
LSA-R.S. 18:1462(A)(2) presents something of a different problem than subsections (3) and (4) of the statute since it does not on its face strike at protected speech. Rather, it affects only certain conduct, namely the act of remaining at a polling place after having received written instructions to depart.
This Court earlier visited this subsection of the statute in State v. Stilley, 416 So.2d 928 (La.1982), which also involved the prosecution of a defendant for refusing to leave the premises of a polling place after being instructed to do so. At the time of the Stilley decision, LSA-R.S. 18:1462(A)(2) made it a criminal offense "[t]o loiter within (600 feet) of any polling place." After considering the inherent vagueness of the term "loiter," the Court noted that "[a]lmost any citizen within a six hundred foot radius of a polling place... could be charged with loitering." Stilley, supra, at 929. In addition, the Court observed that "[a] criminal statute is unconstitutionally overbroad if its enforcement must necessarily be arbitrary." Id. Based upon these observations, the Court concluded that "the statute in question is both vague and overbroad," and accordingly declared it an *903 unconstitutional exercise of legislative authority. Id.
The Legislature promptly acted to amend the statute. See La.Acts 1982, No. 778, § 1. The amended version of LSA-R.S. 18:1462(A)(2), the one now before the Court, makes it a crime for any person to remain within 600 feet of a polling place "after having been directed, in writing, by an election commissioner or law enforcement officer to leave the premises or area of a polling place."[23] The current subsection (2) of the statute, while criminalizing the refusal to leave a polling site after being instructed to do so by designated authorities, offers no guidelines to election commissioners or law enforcement officers regarding when it is proper to instruct a person to leave the vicinity of a polling site. Thus, the criminality of such conduct is a matter solely within the discretion of the official on the scene.
LSA-R.S. 18:1462(A)(2) no longer suffers from the vagueness that plagued its earlier incarnation, i.e., it now gives adequate notice to the general public of what conduct is criminal. See State v. David, 468 So.2d 1126, 1128-1129 (La.1984), cert denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). However, the updated version still suffers from the infirmities which concerned the Stilley Court, i.e., any citizen within 600 feet of a polling place may still be charged with a crime, and "enforcement must necessarily be arbitrary." While the Legislature may of course act to define criminal conduct, "[i]t cannot constitutionally do so through the enactment and enforcement of [a statute] whose violation may entirely depend upon whether or not a policeman is annoyed." Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).
The United States Supreme Court has "recognized ... that the more important aspect of the vagueness doctrine `is not actual notice, but the other principal element of the doctrinethe requirement that a legislature establish minimal guidelines to govern law enforcement.'" Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983), quoting Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). We have recognized the compelling interest which the State has in maintaining the orderliness and integrity of the election process, but "[a]s weighty as this concern is, ... it cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity." Kolender, supra, 461 U.S. at 361, 103 S.Ct. at 1863 (citation omitted).[24]
We do not say that the Legislature cannot place limitations upon persons remaining in and around the environs of a polling place; in fact, we have already stated that such limitations are often necessary to the efficient functioning of the electoral process. We merely hold that the existence of such limitations cannot depend solely upon the whim and caprice of the official on-the-spot. See State v. Broom, 439 So.2d 357, 369 (La.1983) (plurality opinion). While we recognize that the State's Executive branch and district attorneys are accorded some discretion in the manner in which they enforce and prosecute criminal statutes, it is solely the province of the Legislature to designate the boundary between criminal and non-criminal conduct. See La. Const. Art. II, § 2; State v. Truby, 211 La. 178, 29 So.2d 758 (1947). Accordingly, we find LSA-R.S. 18:1462(A)(2), as currently written, unconstitutionally vague insofar as it fails to set forth adequate guidelines governing when and under what circumstances the provision is to be enforced.

E. LSA-R.S. 18:1462(A)(1)
Since Schirmer was not charged with its violation, we note that this decision in no way concerns the continued viability of LSA-R.S. 18:1462(A)(1), which prohibits voter solicitation within 600 feet of a polling place. In addition, since the legislative enactment *904 of this statute contains a severability clause,[25] the striking of subsections (2), (3), and (4) of LSA-R.S. 18:1462(A) should not be read to suggest any constitutional infirmity on the part of LSA-R.S. 18:1462(A)(1).[26]See also LSA-R.S. 24:175.

III. Summary
In summary, we find LSA-R.S. 18:1462(A), subsections (3) and (4), which ban all political activity, even that unrelated to ballot matters, within 600 feet of a polling place on election days, to be an unconstitutionally overbroad infringement upon the First Amendment of the United States Constitution. In addition, we find LSA-R.S. 18:1462(A)(2) to be unconstitutionally vague. LSA-R.S. 18:1462(A)(1), however, was not charged in the bill of information and therefore is not implicated by this decision. Accordingly, the stricken subsections are hereby severed from the remainder of the statute, leaving LSA-R.S. 18:1462(A)(1) in effect. For these reasons, we affirm the decision of the trial court below quashing the bill of information in this case.
JUDGEMENT OF THE DISTRICT COURT AFFIRMED.
MARCUS, J., dissents.
WATSON and KIMBALL, JJ., dissent and assign reasons.
DENNIS, J., concurs and assigns reasons.
WATSON, Justice, dissenting.
Schirmer v. Edwards, 2 F.3d 117 (5th Cir. 1993), U.S. cert. denied, ___ U.S. ___, 114 S.Ct. 1396, 128 L.Ed.2d 70, 62 U.S.L.W. 3657, held that LSA-R.S. 18:1462, which prohibits electioneering around polling places, does not violate the First Amendment of the United States Constitution. The federal court applied strict scrutiny to decide that the 600-foot limitation is narrowly drawn to meet Louisiana's compelling interest in establishing a campaign-free zone. The constitutional compromise between the competing interests, i.e., freedom of speech and unimpeded voting, is not overbroad.
For the reasons assigned by the U.S. Fifth Circuit in Schirmer v. Edwards, I respectfully dissent.
KIMBALL, Justice, dissenting.
The constitutionality of La.R.S. 18:1462(A) was upheld by the United States Fifth Circuit Court of Appeals in a case involving these same parties. Schirmer v. Edwards, 2 F.3d 117 (5th Cir.1993). Applying the strict scrutiny analysis of Burson v. Freeman, ___ U.S. ___, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), the Fifth Circuit found La.R.S. 18:1462(A) to be valid under the First Amendment. A petition for certiorari was subsequently denied by the United States Supreme Court. Recall '92, Inc. v. Edwards, ___ U.S. ___, 114 S.Ct. 1396, 128 L.Ed.2d 70 (1994).
The majority now strikes as unconstitutional the very same statutory provisions considered by the Fifth Circuit in Schirmer v. Edwards, supra, and assertedly does so on federal constitutional grounds. However, I see no reason to depart from the federal appellate court's interpretation of federal constitutional law. Although decisions of intermediate federal appellate courts are not binding upon this court, they are persuasive, State v. White, 321 So.2d 491 (La.1975), and highly persuasive when based on interpretation of the United States Constitution. For these reasons, I respectfully dissent.
DENNIS, Justice, concurring.
I respectfully concur.
The defendant challenged the constitutionality of La.R.S. 18:1462(A) under the free speech guarantees of both the Louisiana and federal constitutions. Therefore, the appropriate *905 procedure for deciding a case such as this is to analyze state law, including state constitutional provisions, before reaching a federal constitutional claim. See State v. Hattaway, 621 So.2d 796 (La.1993) and State v. Perry, 610 So.2d 746, 750 (La.1992). Accordingly, I disagree with the majority's pretermission of the state constitutional question. However, because Article I, § 7 of our state constitution grants as broad and arguably broader protection of rights of free speech than the minimum First Amendment safeguards, Mashburn v. Collin, 355 So.2d 879, 891 (La.1977), and because I believe that the majority has applied those minimum safeguards correctly, I join in the judgment of the majority.

ON REHEARING
Rehearing denied.
WATSON, J., concurs and assigns reasons.
MARCUS, KIMBALL and VICTORY, JJ., would grant a rehearing.
JOHNSON, J., not on panel.
WATSON, Justice, concurring in denial of rehearing.
On further reflection, and after considering the effect, particularly in urban areas, of a 600-foot (two football fields) prohibition against any type of political speech, I have concluded there is an unreasonable impingement on the United States and the Louisiana Constitutions. Therefore, I concur in the denial of a rehearing.
NOTES
[*] Judge Felicia Toney Williams, Court of Appeal, Second Circuit, Associate Justice Pro Tempore, not on panel. Rule IV, Part 2, § 3.
[1] § 1462. Acts prohibited on election day; electioneering; exception; enforcement; penalty

A. Except as otherwise specifically provided by law, it shall be unlawful for any person, between the hours of 6:00 a.m. and 9:00 p.m., to perform or cause to be performed any of the following acts within any polling place being used in an election on election day or within any place wherein absentee voting is being conducted, or within a radius of six hundred feet of the entrance to any polling place being used in an election on election day or any place wherein absentee voting is being conducted:
(1) To solicit in any manner or by any means whatsoever any other person to vote for or against any candidate or proposition being voted on in such election.
(2) To remain within any such polling place or place wherein absentee voting is being conducted or within a radius of six hundred feet of the entrance of any such polling place except when exercising the right to vote, after having been directed, in writing, by an election commissioner or law enforcement officer to leave the premises or area of a polling place or after having been directed, in writing, by a registrar or deputy registrar to leave the place wherein absentee voting is being conducted.
(3) To hand out, place, or display campaign cards, pictures, or other campaign literature of any kind or description whatsoever.
(4) To place or display political signs, pictures, or other forms of political advertising.
[2] Defendant Schirmer also served Recall '92 as chairman of the petition drive.
[3] The Court directly answered the certified question in the following way:

La.R.S. 18:1462(A)(3) proscribes on election day, outside of the polling place itself but within a radius of six hundred feet from the entrance thereto, all solicitation of signatures for a recall petition that is not on the ballot that is to be voted on at the election for which the polling place is open. La.R.S. 18:1462(A)(4) proscribes in the polling place or said six hundred foot radius all wearing of clothing or buttons bearing visible words or symbols supportive of such recall.
Schirmer, supra, at 949.
The Louisiana Legislature has since clarified this issue by enacting LSA-R.S. 18:1300.6(A), which makes it a misdemeanor offense for "any person to circulate recall petitions or seek signatures to a recall petition within any polling place... or within a radius of (600) feet of the entrance to any polling place ... on election day." See La.Acts 1993, No. 219, § 1. While the constitutionality of LSA-R.S. 18:1300.6(A) is not currently at issue, we do consider our decision in this case instructive on this point.
[4] This action of the Fifth Circuit was of course predicated upon the probability of the federal plaintiffs' success in their suit. That determination was in large measure based upon the testimony presented on October 19 and 20 before the federal district court in Baton Rouge. Since the evidence adduced during those two days is not part of the record before us, it can have no impact upon our consideration or decision in this case. However, as the decision of the Fifth Circuit granting injunctive relief was properly introduced into evidence in the proceeding below, we have considered its contents, including the reasons given by the Fifth Circuit for its ruling, in arriving at our decision.
[5] This motion challenged the statute's constitutionality on the grounds of violation of the free speech provisions of the federal and state constitutions, including overbreadth, the selective enforcement of the statute against Schirmer, and "other reasons which will be shown at the hearing of this motion." In addition, Schirmer has raised before this Court the question of whether the statute is unconstitutionally vague.
[6] All four witnesses were called by the defense. They included Jerry Fowler, Commissioner of Elections and Voter Registration for the State of Louisiana; Doug Welborn, Clerk of Court for the Nineteenth Judicial District (East Baton Rouge Parish), State of Louisiana; Rosemary Cannon, Supervisor of the Election Department for Welborn; and the defendant, Theodore Schirmer.
[7] The facts relied upon by the trial court were in large measure culled from the opinion of the Fifth Circuit rendered in conjunction with the granting of Schirmer and the other federal plaintiffs' motion for an interim injunction. See Schirmer v. Edwards, supra, at 8. The Fifth Circuit's well-researched opinion also established the following:

We note that the distance prescribed by section 1462A is 600 feet, 6 times that sustained in Burson; the area involved is more than 1,130,000 square feet, approximately 36 times as large as that involved in Burson (31,400 square feet). This is greater than any state except Hawaii, which uses a 1,000 foot radius. Only two other states, Kentucky and Wisconsin, each five hundred feet, exceed three hundred feet. Some 37 or 38 states use 250 feet or less, some 25 of these using 100 feet or less.
Schirmer, supra, at 8, citing Note, Defoliating the Grassroots: Election Day Restrictions in Political Speech, 77 Geo.L.J. 2137, 2146-47, 2196-2200 (1989).
[8] The panel of the Fifth Circuit which handed down the ultimate decision in Schirmer's federal appeal was not composed of the same judges as the panel that had earlier granted Schirmer's motion for an injunction pending appeal.
[9] Burson will be discussed in greater detail infra. The opinion of the Court in Burson was a plurality opinion authored by Justice Blackmun and joined by Chief Justice Rehnquist and Justices White and Kennedy. Justice Kennedy also filed a separate concurring opinion. Justice Scalia concurred in the judgement, but differed with the plurality on the reasoning behind the judgement. Justice Stevens, joined by Justices O'Connor and Souter, dissented. Justice Thomas took no part in the consideration or decision of the case.
[10] The plaintiffs' petition for certiorari to the United States Supreme Court was subsequently denied, sub nom. Recall '92, Inc. v. Edwards, ___ U.S. ___, 114 S.Ct. 1396, 128 L.Ed.2d 70 (1994), and the decision of the Fifth Circuit is now final.
[11] The State of Louisiana suggests that "a review of Louisiana cases considering free speech indicates that the state constitutional provision grants no additional rights beyond those granted to Louisiana's citizens by the federal constitution." Original Brief of State of Louisiana, P. 7, citing State v. Burgess, 543 So.2d 1332 (La.1989); State v. Newton, 328 So.2d 110 (La.1975); City of Baton Rouge v. Ewing, 308 So.2d 776 (La.1975); City of New Orleans v. Lewis, 263 La. 809, 269 So.2d 450 (1972), rev'd, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). Because we dispose of this case upon federal constitutional grounds, we find it unnecessary to address the extent of the Louisiana Constitution's protection of speech and expression.
[12] For the text of these subsections, see Note 1, supra. LSA-R.S. 18:1462(A)(2) will be considered later in this opinion.
[13] The United States Supreme Court "has held that the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." Burson v. Freeman, supra, ___ U.S. at ___, 112 S.Ct. at 1850, citing Consolidated Edison Co. v. Public Service Comm'n of New York, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); Simon & Schuster, Inc. v. New York Crime Victims Bd., 502 U.S. 105, 115-16, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." Turner Broadcasting System, Inc. v. Federal Communications Commission, ___ U.S. ___, ___, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1993).
[14] No right is more precious in a free country than that of having a choice in the election of those who make the laws under which, as good citizens, they must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).
[15] While this Court is aware that Burson was a plurality opinion in which only the Chief Justice and three associate justices of the Supreme Court joined, we join those courts before us in concluding that Burson must dictate, directly or indirectly, the result in this case. See, however, R.A.V. v. St. Paul, ___ U.S. ___, ___ _ ___, 112 S.Ct. 2538, 2554-2555, 120 L.Ed.2d 305 (1992) (White, Blackmun, O'Connor, and Stevens, Jj., concurring) (questioning continued vitality of Burson). In doing so, we recognize that Burson represents somewhat of a departure from the trend in the jurisprudence of a number of lower courts. See Clean-Up '84 v. Heinrich, 759 F.2d 1511 (11th Cir.1985); Committee for Sandy Springs v. Cleland, 708 F.Supp. 1289 (N.D.Ga. 1988); Florida Committee for Liability Reform v. McMillan, 682 F.Supp. 1536 (M.D.Fla.1988); Firestone v. News-Press Publishing Co., 538 So.2d 457 (Fla.1989); Dorn v. Board of Trustees, 203 Mont. 136, 661 P.2d 426 (1983). However, we also discern a separate trend in the jurisprudence of the Supreme Court, culminating in Burson, which shows deference to State regulation aimed at preserving the integrity of the electoral process. See Munro v. Socialist Workers Party, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). In addition, we observe that while Burson was only a plurality decision, the concurring opinion of Justice Scalia rested upon grounds even more deferential to State regulation. For these reasons, we adopt the analysis set out in Burson in our consideration of this case.
[16] See text at note 9, supra.
[17] The Court also noted, perhaps contradictorily, that

we simply do not view the question whether the 100-foot boundary line could be somewhat tighter as a question of `constitutional dimension.' Reducing the boundary to 25 feet, as suggested by the Tennessee Supreme Court, is a difference only in degree, not a less restrictive alternative in kind.
Burson, supra, at ___, 112 S.Ct. at 1857. The United States Fifth Circuit relied upon this passage in reaching its decision, finding that it "suggests that the plurality would have supported a 600-foot limitation" such as that before this Court. Schirmer, supra, 2 F.3d at 122. We reject this reasoning insofar as it intimates that the size of the protective zone is irrelevant to a determination of the extent to which First Amendment rights have been "significantly impinged." As the Burson plurality itself observed, "[t]he real question is how large a restricted zone is permissible or sufficiently tailored." Burson, supra, ___ U.S. at ___, 112 S.Ct. at 1856.
[18] The Burson plurality, in adopting this approach, appears to have departed from the general policy that "[b]road prophylactic rules in the area of free expression are suspect." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).
[19] We note in passing that at least one other jurisdiction has read Burson to approve "a prohibition on all speech within certain geographic boundaries." State v. Petersilie, 334 N.C. 169, 432 S.E.2d 832, 842 (1993).
[20] Schirmer has raised arguments in this Court concerning whether the statute under which he is charged is unconstitutionally "vague," a specie of due process violation. We express some doubt regarding this proposition as it relates to LSA-R.S. 18:1462(A)(3) and (4), especially in light of our previous construction of the challenged statute in response to the Fifth Circuit's certified question. See Schirmer, supra, 608 So.2d at 949 ("[w]e find that the clear intent of this statute ... is to prohibit political activity within 600 feet of the polls on election day"). However, we also note that vagueness and overbreadth are related concepts, and that the Supreme Court often speaks of them in the same breath. See Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120-1121, 14 L.Ed.2d 22 (1965). Accord, Note, The Void for Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 110-113 (1960). Because we find LSA-R.S. 18:1462(A)(3) and (4) to be an unconstitutionally overbroad limitation upon Free Speech, we need not address the vagueness issue as to those subsections of the statute.
[21] However, since overbreadth is such "strong medicine," a court should strike a statute as overbroad "only when the flaw is a substantial concern in the context of the statute as a whole." Broadrick v. Oklahoma, 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 2916, 2917-2918, 37 L.Ed.2d 830 (1973). See also Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 636-638, 100 S.Ct. 826, 835-837, 63 L.Ed.2d 73 (1980), re'hg denied, 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 250 (1980). We have no problem in applying an overbreadth analysis in this case, since the constitutional "flaw" which we perceive, i.e. the amount of protected speech drawn into the net of LSA-R.S. 18:1462(A), is central to the statute's purpose, namely to prohibit political expression around polling places in order to protect the integrity of the electoral process.
[22] Jerry Fowler, the Commissioner of Elections, testified at the hearing on the motion to quash that the effective range of the statute was changed from the prior 300 foot threshold to a 600 foot radius in response to specific incidents in a 1979 election. In addition, the federal Fifth Circuit, albeit upon consideration of a different record, concluded that "[o]nly after the 300-foot limitation failed to remedy the poll worker problem did the legislature take the next step to 600 feet." Schirmer, supra, 2 F.3d at 122. We note these facts in conjunction with the observation that our decision today does not include any ruling concerning the constitutionality of the 600 foot statutory range alone.
[23] LSA-R.S. 18:1462(A)(2) makes it clear that the prohibition does not apply when one is "exercising the right to vote."
[24] Although vagueness is a doctrine rooted in due process and not the First Amendment, we note that the State's design contains the "potential for arbitrarily suppressing First Amendment liberties." Shuttlesworth v. City of Birmingham, 382 U.S. 87, 91, 86 S.Ct. 211, 214, 15 L.Ed.2d 176 (1965).
[25] If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.

La.Acts 1980, No. 810, § 2. See also La.Acts 1982, No. 778, § 4.
[26] Although not called upon to do so, we observe that a narrowly tailored statute such as LSA-R.S. 18:1462(A)(1), addressing itself directly to the evils of voter intimidation and in so doing minimizing the "impingement" of First Amendment freedoms, presents a markedly different question from the sort of broad limitation of political speech found unconstitutional supra.