RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0181P (6th Cir.)
File Name: 02a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN V. FRANK; MARCO
SOMMERVILLE; JOHN W.
VALLE; ROBERT G.
KONSTAND; GERALD
HOLLAND; NANCY HESLOP;
CHARLES WALKER,
     *Plaintiffs-Appellees/*
       *Cross-Appellants,*


    *v.*


CITY OF AKRON,
     *Defendant-Appellee,*


BRUCE KILBY; MIKE
PARSONS; PATRICIA
LONGVILLE; GREGORY D.
COLERIDGE; the YES on 11
CAMPAIGN,
     *Intervenors-Appellants/*
       *Cross-Appellees.*

Nos. 00-3050/3070

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 98-02862—Dan A. Polster, District Judge.

Argued: November 29, 2001

1

Decided and Filed:  May 22, 2002

Before:  MERRITT, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Brian J. Williams, Akron, Ohio, for Appellants. Robert M. Gippin, THOMPSON HINE, Cleveland, Ohio, Cheri B. Cunningham, CITY OF AKRON, DEPARTMENT OF LAW, Akron, Ohio, for Appellees. **ON BRIEF:** Brian J. Williams, Akron, Ohio, Warner D. Mendenhall, LAW OFFICE OF WARNER MENDENHALL, Akron, Ohio, for Appellants.    Robert M. Gippin, Karen Kelly Grasso, THOMPSON HINE, Cleveland, Ohio, Cheri B. Cunningham, Max Rothal, CITY OF AKRON, DEPARTMENT OF LAW, Akron, Ohio, for Appellees.

MERRITT, J., delivered the opinion of the court, in which CLAY, J., joined.  GILMAN, J. (pp. 11-15), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

MERRITT, Circuit Judge.    This case concerns the constitutionality of a campaign finance reform amendment to the City of Akron, Ohio, charter passed by Akron voters in a city-wide referendum.  Plaintiffs are a group of city council members and voters who challenge the charter amendment on First Amendment grounds.  The district court held that three of the four campaign contribution limitations and regulations were unconstitutional.  We believe they are all valid.

the contributor's *home* address.  *Frank*, 95 F. Supp. 2d at 718 (citing Ohio Rev. Code § 3517.10(B)(4)(b)(1) and (F)(1)).  As a result, the district court concluded that Akron's home-address disclosure requirement is not "closely drawn" to accomplish its valid goal of preventing corruption or the appearance of corruption.  In reaching this conclusion, the district court emphasized that mandatory disclosure of a home address "would seriously impinge the First Amendment rights of anyone who may be reluctant, for security reasons, to reveal his or her home address."  *Id*.

The majority opinion, which devotes only one paragraph to this issue of considerable importance, reverses the district court's decision after concluding that "[t]here is no meaningful distinction between requiring a donor to list a 'mailing' address and requiring a donor to list his 'home' address."  Majority Op. 9.  One of the majority opinion's key arguments is that "[m]ost individuals' addresses are listed in the local phone book and are readily available on the Internet."  *Id*.

But requiring all contributors to disclose their home addresses is unnecessarily invasive.  Federal law, for example, accomplishes the same asserted state interest by requiring contributors to disclose only a "mailing address." 2 U.S.C. § 431(13)(A); 11 C.F.R. § 100.12.  The intervening defendants have also failed to establish that, at least with regard to small contributions, there is "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed."  *Buckley*, 424 U.S. at 64.  I would therefore affirm the district court's conclusion that the home-address disclosure requirement is unconstitutional.

For all of the reasons set forth above, I respectfully dissent from those portions of the majority's opinion that uphold §§ 5(D) and 5(G)(1) of the Akron Campaign Finance Charter Amendment.

1998) (voiding contribution limits of $100 in districts with fewer than 100,000 residents, $250 in districts with 100,000 or more residents, and $500 for candidates for statewide offices); *Nat'l Black Police Ass'n v. Dist. of Columbia Bd. of Elections and Ethics*, 924 F. Supp. 270, 282 (D.D.C. 1996) (striking down a Washington, D.C. contribution limit of $100 for candidates for mayor and other district-wide offices)), *vacated as moot sub nom.*, *Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997)). The majority opinion fails to address any of these precedents. Because the relevant case law indicates that the Akron contribution limits are not "closely drawn," I would affirm the district court's conclusion that § 5(D) is unconstitutional.

## II.  Home-address disclosure requirement

Section 5(G)(1) of the charter amendment provides that: "All persons who make any financial contributions or loan to any campaign for municipal office shall be listed by home address on the candidate's Financial Report filed with the Summit County Board of Elections."

The Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley*, 424 U.S. at 64. As a result, "the subordinating interests of the State must survive exacting scrutiny," and there must "be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* (footnote omitted). The intervening defendants contend that the disclosure requirement is "designed to help citizens understand who is potentially influencing local politicians and why they are trying to do so." They also point out that similar disclosures are required pursuant to both Ohio and federal law.

In holding the home-address disclosure requirement unconstitutional as a matter of law, the district court found that the comparable state law does not require disclosure of

## I. Facts

The City of Akron is a home-rule municipal corporation governing approximately 217,000 citizens. The municipal government is composed of an elected Mayor, three elected at-large council members and ten elected ward council members. The Mayor and the at-large council members serve four year terms, and the ward council members serve two-year terms.

In the fall of 1998, intervening defendants Greg Coleridge, Mike Parsons, Patty Longville, Bruce Kilby, and the Yes on 11 Campaign started a grass roots effort to amend the City of Akron charter to place limitations on the financing of municipal elections. On November 3, 1998, the initiative known as "Issue 11" was placed on the election ballot and passed with 68% of the vote. These reforms were designed to stop businessmen and other donors from using campaign contributions to buy city contracts -- a practice said to be demonstrated by a study correlating campaign contributions to the contract awards of the city council -- and other forms of influence over the council's decisions.

In December, 1998, plaintiffs, who include one former council member, two current council members, and three active political contributors, filed suit to challenge the charter amendment on First Amendment and other grounds. Before us on appeal are four specific provisions: non-cash campaign contribution limits of $100 for ward council members and $300 for at-large council members and the Mayor, a *cash* campaign contribution limit of $25, a home address public disclosure requirement for all contributors, and an employer identification requirement for contributors who give $50 or more. The district court granted summary judgment in favor of the plaintiffs on the first three provisions, holding that they violated the plaintiffs' First Amendment right to association, but denied summary judgment on the employer identification requirement.

The intervenors appealed the district court's grant of summary judgment, and plaintiffs cross-appealed the district court's denial of summary judgment as to the employer identification requirement.  The City of Akron, formerly the defendants, joined the plaintiffs on appeal and filed a brief in support of their position.

## II.  Standing

Before addressing the merits of the plaintiffs' claims, we must first address the preliminary issue of standing.  The intervenors claim that the plaintiffs have failed to show an injury in fact, or a personal stake in the case.  As the district court correctly noted, however, where "plaintiffs allege an intention to engage in a course of conduct arguably affected by the statute, courts have found standing to challenge the statute even absent a specific threat of enforcement." *United Food & Commercial Workers International Union v. IBP, Inc.*, 857 F.2d 422, 428 (8th Cir. 1988).  Here, the plaintiffs, as potential candidates and contributors, clearly intend to receive and contribute money in excess of the charter amendment limitations, and therefore have standing.

## III. Discussion of the Merits

Section D provides:

No candidate for Mayor or At-Large Council shall accept or solicit, as a noncash monetary (i.e. checks, money orders, credit cards) or in-kind campaign contribution or loan, more than $300 from any person, campaign committee, political party, or political action committee. No candidate for a Council Ward position shall accept or solicit, as a noncash monetary or in-kind contribution or loan, more than $100 from any person, campaign committee, political party, or political action committee. No person, political action committee, political party, or political campaign shall contribute funds or in-kind contributions in excess of said amounts.  Contributions

contributions.").   Such grandiose statements and general philosophizing are irrelevant to the analytical framework that we are charged with applying pursuant to binding Supreme Court precedent.

One serious problem with the majority's broad generalizations is that they give no indication of any limiting principle.  Under the majority's rationale, there apparently would be no constitutionally significant difference between a law imposing a $1,000 contribution limit and one imposing a $1 contribution limit.  Surely that is not what the Supreme Court meant to imply when it stated that "the dollar amount of the limit need not be "fine tun[ed]." *Nixon*, 528 U.S. at 388.

The district court's conclusion that the contribution limits are unconstitutional was based upon a careful examination of the available federal-court precedents.   By analyzing these cases, the district court was able to determine the general parameters of what contribution limits have been upheld as being "closely drawn" to accomplish the valid goal of preventing corruption or the appearance of corruption. After finding that no federal court had ever upheld the drastically low contribution limitations presented in the case before us, even in jurisdictions with populations smaller than Akron's, the district court concluded that the charter amendment contribution limitations were not "closely drawn." *Frank v. Akron*, 95 F. Supp. 2d 706, 714-16 & n.14 (N.D. Ohio 1999) (citing *Russell v. Burris*, 146 F.3d 563, 568 (8th Cir. 1998) (overturning contribution limits of $100 and $300 for candidates for statewide offices); *Carver v. Nixon*, 72 F.3d 633, 644 (8th Cir. 1995) (striking down contribution limits of $100 in districts with fewer than 100,000 residents, $200 in districts with 100,000 or more residents, and $300 for candidates for statewide offices); *SEIU v. Fair Political Practices Comm.*, 955 F.2d 1312, 1321 (9th Cir. 1992) (overturning a contribution limit of $1,000 per year for candidates for state and local offices); *California Prolife Council PAC v. Scully*, 989 F. Supp. 1282, 1299 (E.D. Cal.

of corruption.   The Supreme Court has held that the prevention of corruption of elected officials or the appearance of such corruption is a "constitutionally sufficient justification." *Buckley*, 424 U.S. at 26.   Thus the only question presented by the plaintiffs' challenge to this section of the charter amendment is whether the restriction is "closely drawn" to match this "sufficiently important interest."

In holding that the noncash contribution limits are unconstitutional as a matter of law, the district court emphasized that Akron is a city of over 200,000 people, and that such low contribution limits have never been upheld by a federal court, even in smaller jurisdictions.   It thus concluded that the charter amendment is not "closely drawn" to accomplish the valid goal of preventing corruption or the appearance of corruption.   The district court reached this conclusion before *Nixon* was decided, but its analysis is consistent with the clarification of *Buckley* provided by the Supreme Court in the *Nixon* case.

Although the majority correctly states the standard announced by the Supreme Court in *Buckley* and clarified by *Nixon*, it fails to apply the standard.   Instead, after quoting the relevant passage from *Nixon*, the majority goes on to espouse its theory on the proper role of courts in our society and to indict *Lochner*-era jurisprudence.   Majority Op. 5 ("It is not the function of the courts to take sides in partisan politics or partisan arguments about campaign finance reforms.   It is the court's function to interpret the Constitution which contains no explicit provisions concerning campaign finance or insuring that a particular group may dominate democratic government because of its wealth."); Majority Op. 6 ("Money buys many of the good things in life, but no one has cited any constitutional history suggesting that money is supposed to be the milk of politics or that large political contributions are a necessary ingredient of representative government protected by the Constitution.   Constitutional history does not support the idea that *laissez faire* economics is embodied in the First Amendment to assure the right to make large campaign

from the candidate and labor of volunteers are exempt from these provisions.

In contesting this provision, the primary right asserted by the plaintiffs is the First Amendment right to association.   As explained in *Buckley v. Valeo*, 424 U.S. 1 (1976), contribution restrictions bear more heavily on the right to association than on the freedom to speak.   *Id.* at 24-25.   As a result, "a contribution limitation surviving a claim of associational abridgement would survive a speech challenge as well." *Nixon v. Shrink Missouri Govt. PAC*, 120 S.Ct. 897, 904-5 (2000).   While not clearly defining the appropriate level of scrutiny as intermediate or strict, the Supreme Court in *Shrink* summarized the *Buckley* standard as follows:

> . . . a contribution limit involving 'significant interference' with associational rights,   could survive if the Government demonstrated that contribution regulation was 'closely drawn' to match a 'sufficiently important interest,' though the dollar amount of the limit need not be 'fine tun[ed],'

*Id.* at 904 (*quoting Buckley* at 25, 30)(internal citations omitted).   The *Buckley* and *Shrink* cases are not designed to stop legislation to clean up the political corruption said to be caused in recent years  by large campaign contributions to elected officials and political parties.   It is not the function of the courts to take sides in partisan politics or  partisan arguments about campaign finance reforms.   It is the court's function to interpret the Constitution which contains no explicit provisions concerning campaign finance or insuring that a particular group may dominate democratic government because of its wealth.

On the surface, it is difficult to see how a restriction on political contributions to a hundred to three hundred dollars in a local election could significantly interfere with a donor's ability to "associate" with a particular political candidate. Limiting   the   amount   of   one's   contribution   does   not

perceptibly decrease the degree of association or restrict the contributor's ability to associate with the candidate of his choice. Cf. *Buckley*, 424 U.S. at 21 (finding that the size of one's contribution does not necessarily control the strength of one's political voice or influence). By limiting the amount that an individual may contribute to a campaign, the charter amendment does not foreclose that individual from freely associating himself with a candidate or participating personally in the campaign in any other way, including making expenditures on behalf of the candidate with whom he wishes to associate. *See Buckley,* 424 U.S. at 22 (finding that expenditures were more significant than contributions in ensuring that associations could "effectively amplify the voices of their adherents, the original basis for the recognition of the First Amendment freedom of association"). Money buys many of the good things in life, but no one has cited any constitutional history suggesting that money is supposed to be the milk of politics or that large political contributions are a necessary ingredient of representative government protected by the Constitution. Constitutional history does not support the idea that *laissez faire* economics is embodied in the First Amendment to assure the right to make large campaign contributions. As Holmes noted in his *Lochner* dissent:

> The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics. . . . [A] Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, or even shocking, ought not to conclude judgment upon the question of whether statutes embodying them conflict with the Constitution of the United States.

*Lochner v. New York*, 198 U.S. 45, 75-76 (1905)(Holmes, J., dissenting).

---

### CONCURRING IN PART, DISSENTING IN PART

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that § 5(C) of the Akron Campaign Finance Charter Amendment, which sets a *cash* contribution limit of $25, is constitutional, and that the district court's judgment should be reversed and remanded on that ground. The majority and I also agree that the district court correctly concluded that § 5(G)(2), which requires public disclosure of the primary employer of individuals who contribute $50 or more, is constitutional. I disagree, however, with the majority's conclusion that § 5(D), which limits the amount that an individual can contribute to candidates for mayor and city council, and § 5(G)(1), which requires public disclosure of the home address of all individuals who make political contributions, are constitutional. Because I believe that these two sections of Akron's charter amendment violate the First Amendment, I would affirm the district court's conclusion that they are unconstitutional as a matter of law.

### I. Noncash contribution limits

As explained by the majority opinion, § 5(D) prohibits individuals from contributing (1) more than $300 to a mayoral or a city council at-large candidate, or (2) more than $100 to a city council ward candidate.

Campaign-contribution limits implicate the freedom of political association. *Buckley v. Valeo*, 424 U.S. 1, 22 (1976) (per curiam). Although freedom of political association is a "basic constitutional freedom," *id*. at 25 (internal quotation marks omitted), a contribution limit can be constitutional if it is "'closely drawn' to match a 'sufficiently important interest . . . .'" *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387-88 (2000) (quoting *Buckley*, 424 U.S. at 30). In this case, the intervening defendants assert that the contribution limit was imposed to prevent both corruption and the appearance

§ 104.3(a)(4)(i). The district court held that because there is no difference in kind between the $100 state statutory restriction (as well as the $200 federal restriction) and the $50 charter amendment restriction, the charter amendment withstands constitutional scrutiny. We agree. There is no basis for drawing a constitutional line distinguishing between the triggering amount of $50 in a local election and $100 in a state election.

In sum, we reverse the district court's grant of summary judgment on the cash and non-cash contributions and the home address disclosure requirement, and we affirm its denial of summary judgment on the employer disclosure requirement.

Our inquiry does not end here, however, because in *Buckley* and *Shrink*, the Supreme Court broadly defined an individual's right of association to include the ancillary right of the candidate to "amas[s] the resources necessary for effective advocacy." *Shrink,* 120 S.Ct. at 909 (quoting *Buckley,* 424 U.S. at 21). Thus, the Supreme Court would find an unconstitutional infringement of an individual's right of political association where "the contribution limit was *so radical in effect as to render political association ineffective*, drive the sound of the candidate's voice below the level of notice, and render contributions pointless" (emphasis added). *Shrink*, 120 S.Ct. at 909.

Applying the Court's broader definition of association, we hold that the contribution limits in the Charter Amendment are not "so radical in effect to render political association ineffective" or "contributions pointless," and therefore do not violate the First Amendment right of association. The individual non-cash contribution limit enacted by 68% of the voters does not inhibit candidates from accumulating substantial war chests of campaign money, but it does require them to broaden the number of contributors. They may no longer rely on a small number of large donors who want city contracts or other types of political largess. The restriction on contributions clearly achieves the significant objective of the citizens of Akron in limiting the appearance and the reality of corruption in the form of *quid pro quo* agreements and undue political influence exercised by large contributors. At the same time, the limit does not render contributions pointless or make political association ineffective because each candidate has an ample opportunity to raise significant capital to win a local election.

Furthermore, with the many means of contacting voters available to candidates in local elections, it is hard to see how these limitations could "drive the voice of the candidate below the level of notice." With the internet and e-mail readily available to the public, in addition to personal campaigning, mail, radio, television and billboards,

candidates have a variety of options for communicating their message to the general voting public, many of which are relatively inexpensive in a town the size of Akron. In addition, local elections such as the ones at issue here rarely rely on the mass media campaigns seen on the national level which are themselves constitutionally limited to $1000 contributions. In sum, we conclude that neither the voter's right of association nor the candidate's ancillary right arising therefrom are unduly infringed upon by the $100 and $300 contribution limits.

Section C is the next provision of the charter amendment at issue. It governs cash contributions:

No candidate for Mayor or City Council shall accept, as a campaign contribution, more than $25 in cash (i.e. hard currency) from any person within any fundraising season. No person shall contribute cash in excess of said amount.

We find that the cash contribution limitation of $25 does not violate plaintiffs' right to associate. A companion provision to the non-cash contribution limit, the cash limitation does not limit the overall amount which a person can contribute; it only limits the amount which one can give without some record of a gift. This restriction clearly does not unduly burden a contributor because it does not affect the *amount* that one may contribute; it simply affects the *manner* in which one may contribute. A candidate's ancillary right to associate also does not suffer because a contributor pays by check, credit card, or money order rather than with cash. The provision serves the significant governmental interest of accountability by forcing contributions to be traceable. As a result, it makes corruption more difficult to hide in the face of a campaign audit. It is clearly valid under the First Amendment.

The last two provisions at issue concern campaign disclosure. The first, section G (1), provides:

Home Address: All persons who make any financial contribution or loan to any campaign for municipal office shall be listed by home address on the candidate's Financial Report filed with the Summit County Board of Elections.

In addition to section G(1) of the charter amendment, contributions to both the federal and Ohio statewide elections are subject to disclosure requirements, with both federal and Ohio state law requiring a "mailing address." *See* Ohio Rev. Code §§ 3517.10(B)(4)(b)(1) and (F)(1); *see* 2 U.S.C. § 431(13)(A) and 11 C.F.R. § 100.12. Disclosure provisions such as these serve a significant governmental interest in providing an accountability mechanism to track campaign donors and safeguard against corruption. There is no meaningful distinction between requiring a donor to list a "mailing" address and requiring a donor to list his "home" address. Most individuals' addresses are listed in the local phone book and are readily available on the Internet. In addition, in order to vote and be placed in the proper precinct, voters must provide their home address. To require donors to provide their home address does not add any substantial burden that unduly burdens their right to association.

The second disclosure provision, section G(2), provides:

Employer Identification: The candidate for any municipal office shall identify all persons who contribute $50 or more by primary employer. If this information is not on file with the Summit County Board of Elections, the contribution shall be returned to the contributor within thirty (30) days after the filing of the candidate's Financial Report.

Again, Ohio statewide and federal elections place similar restrictions on contributions, requiring disclosure of a contributor's current employer where the contribution is over $100.00, and $200.00, respectively. *See* Ohio Rev. Code § 3517.10; *see* 2 U.S.C. § 434(b)(3)(A) and 11 C.F.R.